******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

GREENWOOD MANOR, LLC *v.* PLANNING AND
ZONING COMMISSION OF THE CITY
OF BRIDGEPORT
(AC 35612)

Gruendel, Sheldon and Schaller, Js.

*Argued March 10—officially released May 27, 2014*

(Appeal from Superior Court, judicial district of
Fairfield, Radcliffe, J.)

*Corey S. Fitzgerald*, with whom, on the brief, was
*Lucas B. Rocklin*, for the appellant (substitute plaintiff).

*Edmund F. Schmidt*, assistant city attorney, for the
appellee (defendant).

*Opinion*

GRUENDEL, J. Connecticut law obligates every municipality's planning commission to promulgate an updated plan of conservation and development on a decennial basis. General Statutes § 8-23 (a) (1). Our law further requires, as a prerequisite to any change in a municipality's zoning regulations and zoning districts, the zoning commission to "take into consideration the plan of conservation and development, prepared pursuant to [§] 8-23, and . . . state on the record its findings on consistency of [any] proposed establishment, change or repeal of such regulations and boundaries with such plan. . . ." General Statutes § 8-3 (b). Pursuant to those statutory mandates, the defendant, the Planning and Zoning Commission of the City of Bridgeport (commission) adopted an amended plan of conservation and development that proposed no change with respect to the property of the plaintiff, Allstar Sanitation, Inc.[1] Consistent with that plan, the commission thereafter undertook a comprehensive review of its zoning regulations and zoning districts, which culminated with an amendment thereof. That action did not alter the zoning of the plaintiff's property in any manner.

The plaintiff timely appealed from the commission's decision to the Superior Court, which dismissed the administrative appeal for lack of aggrievement. The issue presented in this appeal concerns the propriety of that determination. We affirm the judgment of the Superior Court.[2]

The relevant facts largely are undisputed. The plaintiff owns a 9.9 acre parcel of unimproved land known as Hart Street Rear in Bridgeport (property). At all relevant times, the property was owned by the plaintiff or its predecessor in title, Greenwood Manor, LLC (Greenwood). In early 2008, following an exhaustive review that included an examination of the existing zoning map and regulations, the commission adopted an amended plan of conservation and development for the city of Bridgeport (plan). The plan did not recommend any change to the zoning classification of the plaintiff's property, which continued to be designated as part of the "Residential A Single Family Zone (R-A)." See Bridgeport Zoning Regs., § 3.1.1.

Following the submission of a petition to revise certain zoning regulations by the city's planning department, the commission, acting in its legislative capacity; see *Konigsberg* v. *Board of Aldermen*, 283 Conn. 553, 581, 930 A.2d 1 (2007) ("[a] zoning change . . . [is considered a decision] of the [commission] acting in its legislative capacity"); R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (3d Ed. 2007) § 33:2, p. 233 ("[a] zoning commission, when amending zoning regulations or passing a zone change, acts in a legislative capacity"); conducted a review of its zoning

regulations and zoning map.[3] The commission held a public hearing on the proposed zoning revisions on November 10, 2008. At that time, the substance of those revisions was presented without reference to any specific properties. The commission also received a letter dated November 10, 2008, from Attorney Raymond Rizio.[4] Writing on behalf of Greenwood, Rizio stated in relevant part that "the current [zoning] map designates [the property] as 'Residence A.' My client strongly believes that this is a complete underutilization of the property and that the current designation should be 'Residence C.' " After suggesting that rezoning the property to the Residential C multi-family zone (R-C) district would permit the construction of a condominium complex on the property and that such development would inure to the benefit of the city, Rizio concluded his letter by noting his appreciation for the commission's "careful review" of his client's request.

At its September 14, 2009 meeting, the commission further considered various revisions to the zoning regulations and zoning map. At that time, it discussed changes with respect to specific parcels. When the plaintiff's property came up, an unidentified individual stated that "our staff recommendation is to leave it as R-A." Acting Chairman Mel Riley inquired as to whether "anybody [had] a problem with that" and Commissioner Carl Kish responded, "Yeah, I'd like to touch base on that." Kish then stated that "[t]he biggest problem I have with the property was . . . the density. . . . [S]ingle family homes . . . would take up every square inch of that land. That's not a good land use decision." Riley then stated: "I'm going to play devil's advocate. We can—this commission can decide how many houses in a single family development or what the site plan standards need to be. . . . We do have more control when it is R-A than an R-C zone." Riley also noted that "there's nothing to say a developer can't come back at some point in the future. You know, the day after this passes. . . . But we have no one right now. . . . We have no one asking [to develop it as] R-C, we have a lot of people asking for it to stay R-A. . . . [T]he planners in the commission recommended that it be R-A, our staff is recommending that it be R-A, so why not keep it R-A? . . . There's no compelling reason to change it . . . to R-C until somebody wants to develop it."

Commissioner Barbara Freddino reminded the commission that its consideration of the plaintiff's parcel "was driven . . . by one person, one developer's comment." When Kish clarified that, to be precise, the suggestion came from one "particular attorney," Freddino replied, "Okay. But the whole thing is this. That he does have the right—if the consensus is, to leave it as R-A, he does have the right to come and ask for a zone change. . . . [W]e're not precluding them from coming and presenting us with an application for a R-C zone

with whatever kind of development they would like to do. And I believe that gives everyone due process." After a brief discussion stemming from another commissioner's concern that the plaintiff's property was part of a flood plain, Kish interjected, "let's find out where the consensus [is] and move on." By a vote of five to four, the commission then reached a preliminary consensus to reclassify the plaintiff's property as part of the Residential C multi-family zone.

The commission convened a second public hearing on October 14, 2009. The agenda identified eleven specific properties and their accompanying proposed zones; included on that list was the plaintiff's property with "R-C" as the proposed zone. The commission heard testimony from numerous individuals regarding that potential change. Several spoke in favor of rezoning the property as R-C, including Paul S. Timpanelli, President and Chief Executive Officer of the Bridgeport Regional Business Council. Timpanelli stated that although he understood "the concerns of that neighborhood for that higher residential use . . . we're firmly convinced that the neighborhood will improve, property values will improve as a result of those changes." Others in attendance voiced strong opposition to that zone change. For example, Attorney Michael T. Voytek, chairman of an organization called The Committee to Ungag the People, began his remarks by submitting "approximately a thousand petitions" against the proposed zone changes to the eleven specified properties. Voytek urged the commission, on behalf of his organization, "to keep all these areas zoned as Residential A." Voytek described the plaintiff's parcel as a "crisis area" that needed to remain in the single family residential zone.

The commission also heard from Christopher Caruso, a Bridgeport resident and State Representative of the 126th District, who spoke on behalf of his constituents. With respect to the plaintiff's property, Caruso encouraged the commission to "[m]aintain [it] as Residence A in keeping with the character of the current single family neighborhood and in conformity with the [plan] to avoid spot zoning." Caruso explained that the property "is being sought after by the State Department of Environmental Protection with the support of the Mayor and the City of Bridgeport. This property is critically needed to address serious North End flooding . . . . In September, I cast a vote . . . to approve a bill which was signed by the Governor into law that provides the city with much needed funds to purchase this property." Caruso continued: "The alleged owner of [the plaintiff's] property who is affiliated with reputed organized crime figures is attempting to change the zone, which will increase the value of the property and thus, the amount that the City and the State will be required to pay . . . [should they decide to purchase it] effectively holding Bridgeport ransom. Unfortunately, the sister of a current member of the [commis-

sion] is dating the reputed head of the same organized crime family who is affiliated with the alleged owner of the property. We are extremely concerned that if the zone change on [the plaintiff's property] occurs, it provides a ripe opportunity for organized crime to gain a school yard foothold with the children that attend a . . . school adjacent to this property." Notably, the record does not contain any evidence, testimonial or otherwise, submitted by or on behalf of the plaintiff during that hearing. After receiving input from numerous citizens on a variety of issues, the commission closed the public hearing and took no further action on the matter that evening.

The commission next discussed the proposed zoning changes during its November 14, 2009 meeting. Following a review of certain technical revisions to the zoning regulations, commission members noted that "the only discussion that remains is the map issues. The infamous eleven [parcels]." Riley clarified that the commission was not voting on the matter that evening, but rather simply obtaining a consensus to enable its staff to prepare accordingly for the commission's official action thereon. As he explained, "[t]hese eleven items, we want to be sure that we have a consensus. Everything else is done." Kish, who throughout the proceedings consistently was the most outspoken advocate on the commission for rezoning the property, began the discussion by articulating his support of a zone change of the plaintiff's property from R-A to R-C. Commissioner Ann Pappas-Phillips disagreed, noting that the plan "calls for this piece to remain in [the] R-A [zone]." Riley then opined that "[t]here is one thing I would like to add to that is this. You know, some of these controversial issues can get, you know, spend years discussing and we've gotta put this to bed. And in the interest of, you know, making things for . . . the regulations to go into effect, I think when in doubt, we leave [the property] the way it is. Because we can always change it. . . . Otherwise, we'll be spending forever on this and it is not unfair to anybody to leave the property the way it is. . . . [T]hey can come, they can always request . . . a zone change." Although Kish reminded the commission that it already had reached a consensus on the matter, one unidentified voice emphasized that the commission had "heard from the public" since that time. The commission thereafter reached a consensus, by a vote of five to three, to take no action on the plaintiff's property and "leave this R-A."

The commission met again on November 30, 2009. At that time, it voted unanimously to revise certain portions of its zoning regulations. The commission also voted on what Riley described as "the more controversial part"—the revised zoning map. As acting secretary, Freddino stated that "[t]he next item is the . . . Resolution regarding the adoption of a new Zoning Map, November 30, 2009. Application number . . . 08-91.

Applicant: [the commission]." In that resolution, the commission specifically found, inter alia, that (1) "[s]ubsequent to the close of the public hearings, the proposed zoning map was modified to incorporate some of these public comments"; (2) "the proposed zoning map is fully consistent with the [plan]"; and (3) "maintaining the existing zoning classifications for some properties that require additional evaluation is not inconsistent with the [plan]." By a vote of six to three, the commission approved that resolution, thereby adopting the revised zoning map. In so doing, the commission left the zoning classification of the plaintiff's property unchanged.

From that decision, Greenwood appealed to the Superior Court.[5] After first permitting the parties to brief the issue, the court held a hearing on whether the plaintiff could establish the requisite aggrievement to proceed with its administrative appeal. The court subsequently concluded that the plaintiff had not met its burden to demonstrate that it was statutorily or classically aggrieved by the commission's decision. The court, therefore, dismissed the appeal for lack of subject matter jurisdiction.

The plaintiff thereafter filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o). We granted the petition and this appeal followed.

At the outset, we note that "[p]leading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of a plaintiff's appeal. . . . [I]n order to have standing to bring an administrative appeal, a person must be aggrieved. . . . Standing . . . is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . .

"Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the decision, as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the agency's decision has specially and injuriously affected that specific personal or legal interest. . . .

"Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Citations omitted; internal quotation marks omitted.) *Mou-*

*tinho* v. *Planning & Zoning Commission*, 278 Conn. 660, 664–65, 899 A.2d 26 (2006).

"Aggrievement presents a question of fact for the trial court. . . . The scope of review of a trial court's factual decision on appeal is limited to a determination of whether it is clearly erroneous in view of the evidence and pleadings. . . . Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 665–66. Finally, we are mindful that in the context of zoning disputes, our Supreme Court has stated that "[b]ecause aggrievement is a jurisdictional question, and therefore, the key to access to judicial review, the standard for aggrievement is rather strict." (Internal quotation marks omitted.) *Gladysz* v. *Planning & Zoning Commission*, 256 Conn. 249, 257, 773 A.2d 300 (2001).

This appeal is about zone changes. The precise issue presented is one of first impression—whether an owner of property has standing to appeal when it is undisputed that (1) its property was not the subject of a zoning application, and (2) the zoning classification of its property was not altered, amended or otherwise affected by a zoning commission's sua sponte revision of its zoning regulations and zoning map. The plaintiff contends that it is both statutorily and classically aggrieved in such an instance. We consider each claim in turn.

I

STATUTORY AGGRIEVEMENT

Under Connecticut law, "any person aggrieved" by a decision of a zoning commission may take an appeal to the Superior Court. General Statutes § 8-8 (b). The plaintiff claims that, pursuant to the plain and unambiguous language of § 8-8 (a) (1), it is statutorily aggrieved by the commission's amendment of its zoning map.[6] That claim presents an issue of statutory construction, over which our review is plenary. See *Buttermilk Farms, LLC* v. *Planning & Zoning Commission*, 292 Conn. 317, 328, 973 A.2d 64 (2009). "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language *as applied to the facts of* [*the*] *case*, including the question of whether the language actually does apply. . . . In seek-

ing to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, *when read in context*, is susceptible to more than one reasonable interpretation." (Emphasis added; internal quotation marks omitted.) Id.

We thus begin with the language of the statute. Section 8-8 (a) (1) provides in relevant part: " 'Aggrieved person' means a person aggrieved by a decision of a [zoning commission]. . . . In the case of a decision by a zoning commission . . . 'aggrieved person' includes any person owning land that abuts or is within a radius of one hundred feet of any portion of *the land involved in the decision* of the [zoning commission]." (Emphasis added.) The plaintiff argues that although the commission ultimately took no action with respect to its property, the property nonetheless was "land involved" in its decision, as the commission specifically considered a zone change thereto. By contrast, the commission's position is that because its decision was to amend the zoning map with respect to certain parcels that did not include the plaintiff's property, the plaintiff's property was not involved in its decision. Because both are reasonable interpretations, the statute is ambiguous as applied to the facts of this case. In construing the statute, we therefore "must consider [its] legislative history . . . and the circumstances surrounding its enactment, the legislative policy it was designed to implement, the statute's relationship to existing legislation and common-law principles governing the same general subject matter." (Internal quotation marks omitted.) *Benson* v. *Zoning Board of Appeals*, 89 Conn. App. 324, 331–32, 873 A.2d 1017 (2005).

We have examined the legislative history surrounding the enactment of § 8-8 (a) (1), which provides no insight on the distinct issue raised in this appeal. Fortunately, our Supreme Court twice has interpreted the particular statutory language at issue.[7] *Caltabiano* v. *Planning & Zoning Commission*, 211 Conn. 662, 664, 560 A.2d 975 (1989), involved an application for a special exception to excavate a "3.8 acre parcel located deep within [a] 110 acre parcel." The planning and zoning commission granted that request and the plaintiffs, whose property either abutted or was within 100 feet of the 110 acre parcel, filed an administrative appeal in the Superior Court. Id. The court dismissed the appeal, concluding that the plaintiffs were not statutorily aggrieved by the commission's decision. From that judgment, the plaintiffs appealed. As our Supreme Court described it, the "case involves the narrow issue of whether the term

'land involved' in . . . § 8-8 (a), which establishes statutory aggrievement to appeal the decision of a zoning agency to the Superior Court, refers to the overall parcel of land owned by the applicant before that agency or the particular piece of that land that was the subject of the agency decision." (Footnote omitted.) Id., 663.

After noting that the issue presented was one of first impression, the court in *Caltabiano* observed that "[t]he phrase 'any portion of the land involved in any decision of said board' may appear on the surface to be very simple to interpret. The core of the issue, however, is an exceptionally slippery concept." Id., 667. The court found that the "ambiguity in the statute" required resort to "the legislative history and circumstances surrounding the enactment of the statute and the purpose the statute is to serve." Id. After observing that the pertinent legislative history "sheds no light on our quest"; id., 668; the court examined the legislative intent behind the enactment of § 8-8 (a), stating: "We conclude that the legislature presumed as a matter of common knowledge that persons owning property within close proximity to a projected zoning action would be sufficiently affected by the decision of a zoning agency to be entitled to appeal that decision to the court. Giving such a right to the narrow class of abutters and those owning property within 100 feet of the land involved would not unduly enlarge the class of those entitled to appeal such a decision." Id., 668–69. For that reason, the court interpreted the phrase "land involved" to mean the complete tract of land owned by the applicant, rather than simply the portion of the land containing the proposed activity. Id., 663. The court further emphasized that "[o]nly a bright line construction of § 8-8 (a) can avoid the uncertainties of its application to various factual patterns involving proposed zoning decisions affecting only a part of a larger piece of property." Id., 670.

The court confronted a similar claim in *Stauton* v. *Planning & Zoning Commission*, 271 Conn. 152, 856 A.2d 400 (2004). In that case, the issue was "whether the phrase 'land involved in the decision of the board' means the discrete property that is subject to the site specific zoning amendment or the entire zone in which the property is located." Id., 158. Relying principally on *Caltabiano*, our Supreme Court stated: "[W]e must interpret the phrase 'land involved' in § 8-8 (a) (1) in light of the legislature's intent to relieve a narrow class of landowners who are presumptively affected by the zoning commission's adverse decision because of their close proximity to a projected zoning action from the arduous burden of proving classical aggrievement. If we were to interpret the phrase 'land involved in the decision of the board' to mean the entire zone in which the land is located even when only one property located in the zone is affected by the challenged decision, the statutory right of appeal would no longer be limited to

a narrow class of property owners, but would be available to all persons owning land within the zone. . . . [S]uch an interpretation would confer standing on all persons owning land within the R-1, R-2 and LI zones, which constitute a large portion of the town." *Stauton* v. *Planning & Zoning Commission*, supra, 160. Accordingly, the court concluded that "when a zoning decision directly affects only a single property within a zone, the phrase 'land involved in the decision of the board,' as used in § 8-8 (a) (1), does not include the entire zone in which the affected property is located." Id., 161.

From that precedent of this state's highest court, we thus glean two related principles that inform our interpretation of § 8-8 (a) (1) in the present case. First, statutory aggrievement pursuant to that statute is intended to benefit "a narrow class" of property owners. *Caltabiano* v. *Planning & Zoning Commission*, supra, 211 Conn. 669. Second, consistent with the foregoing, we must avoid an interpretation of the phrase "land involved in the decision" of the commission that confers jurisdiction on a wide class of property owners that constitutes "a large portion of the town." *Stauton* v. *Planning & Zoning Commission*, supra, 271 Conn. 160.

It is undisputed that the commission took no action with respect to the plaintiff's property in the present case. As in *Stauton*, the specific zoning changes enacted by the commission here "did not in any way alter the plaintiffs' ability to use and develop their land."[8] Id., 162. As a result, this case stands in stark contrast to *Douglas* v. *Planning & Zoning Commission*, 127 Conn. App. 87, 13 A.3d 669 (2011). Although the commission in *Douglas*—like the commission here—acted in a legislative capacity on its sua sponte application to amend certain zoning regulations; id., 89–90; this court concluded in *Douglas* that the plaintiff was statutorily aggrieved when the amendment "created a defined, bounded zoning district, and . . . [the plaintiff's] property *falls within the particular zone to which the text amendment pertained.*" (Emphasis added.) Id., 101; see also *Ghent* v. *Zoning Commission*, 220 Conn. 584, 587, 600 A.2d 1010 (1991) ("[t]he plaintiffs, as owners of property within the areas affected by the [zoning] amendments, appealed to the Superior Court from the action of the zoning commission in adopting the amendments"). Put differently, the amendment in *Douglas* altered the zoning classification of the plaintiff's property. The plaintiff has provided no appellate authority, nor are we aware of any, to support the proposition, central to its interpretation of § 8-8 (a) (1), that a zoning commission's inaction with a respect to a particular parcel on which no zoning application has been submitted constitutes a formal and appealable decision with respect to that parcel under § 8-8 (a) (1).[9]

To the contrary, we conclude that adoption of the plaintiff's interpretation would yield bizarre and

unworkable results. When a zoning commission anywhere in Connecticut acts sua sponte in its legislative capacity to amend select portions of its zoning map, it necessarily has made a preliminary determination to take no action with respect to excluded properties throughout the municipality. As a result, all such property owners whose property was not reclassified would be statutorily aggrieved. In the present case, there are countless property owners in Bridgeport whose property—like the plaintiff's—the commission elected to leave untouched. Under the plaintiff's logic, all such owners would possess standing to pursue an administrative appeal, in contravention of the mandate of *Caltabiano* and *Stauton* that the class of property owners statutorily aggrieved under § 8-8 shall be a narrow one and not a large portion of the municipality. The legislature could not have intended such a bizarre result, and we will not indulge in one so plainly contrary to the guiding precedent of our Supreme Court.

The plaintiff no doubt would contend that we are amplifying the nature of their claim and argue that there is a significant difference between a silent property owner whose property never is discussed during the commission's proceedings and one who submits a request to have a zoning change to their property considered, which is discussed and voted on by the commission. Although plainly distinct, the contrast nevertheless highlights the "exceptionally slippery" nature of interpreting the phrase " 'any portion of the land involved in any decision' " of the commission. *Caltabiano* v. *Planning & Zoning Commission*, supra, 211 Conn. 667. It proves difficult indeed to differentiate between (1) the owner who makes no request that the commission consider a zone change, (2) the owner who makes such a request but did not provide any testimonial or documentary evidence whatsoever to the commission, such as the plaintiff here, and (3) the owner who makes such a request and expends great sums of time and money to present detailed evidence for the commission, such as expert testimony, land surveys and the like. If, in each instance, the commission elects to take no action with respect to the owner's parcel and leave its zoning classification unchanged, where must the line be drawn? To paraphrase *Caltabiano*, when a zoning commission acts in its legislative capacity on a sua sponte application to amend its zoning regulations or zoning map, "[o]nly a bright line construction of § 8-8 (a) can avoid the uncertainties of its application to various factual patterns" involved in such decisions. Id., 670. In light of the aim of § 8-8 (a) (1) to provide an avenue of appeal to a narrow class of property owners, the clearest construction of the phrase "any portion of the land involved in any decision" in this scenario is that it pertains to land that (1) was the subject of the application or (2) whose zoning classification was altered in some manner by the adopted zon-

ing change.[10]

That interpretation comports with the broader precepts underlying our standing jurisprudence. In interpreting § 8-8 (a) (1), we look not only to the purposes animating the particular legislation at issue, but also to "common-law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Abel* v. *Planning & Zoning Commission*, 297 Conn. 414, 428, 998 A.2d 1149 (2010). "[A]ggrievement is a basic requirement of standing, just as standing is a fundamental requirement of jurisdiction." (Internal quotation marks omitted.) Id., 437. A central tenet of the standing requirement is to ensure that "judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Golden Hill Paugussett Tribe of Indians* v. *Southbury*, 231 Conn. 563, 571, 651 A.2d 1246 (1995). Yet the mechanism employed by the plaintiff in the present case—submitting a letter encouraging the commission to consider a zone change of the plaintiff's property to permit a condominium unit in the midst of a neighborhood consisting of single family homes—thwarts that aim. In such instances in which no formal application has been made by the plaintiff and the property in question is not the subject of the commission's sua sponte application, there is no compulsion to provide notice to neighboring property owners and other interested parties of that proposed change in the classification of the plaintiff's property.[11]

"The concept of notice concerns notions of fundamental fairness, affording parties the opportunity to be apprised when their interests are implicated in a given matter." *Twenty-Four Merrill Street Condominium Assn., Inc.* v. *Murray*, 96 Conn. App. 616, 622, 902 A.2d 24 (2006). "Compliance with statutorily prescribed notice requirements is a prerequisite to a valid action by a land use commission and failure to give proper notice constitutes a jurisdictional defect. . . . Adequate prehearing notice is necessary to inform affected and properly interested parties of their opportunity to be heard and to be apprised of the relief sought. . . . Constructive, rather than actual, notice is required so that as much of the populace as possible is constructively notified of the proposed action. . . . [N]otice of a hearing is not required to contain an accurate forecast of the precise action which will be taken on the subject matter referred to in the notice. It is adequate if it fairly and sufficiently apprises those who may be affected of the nature and character of the action proposed, so as to make possible intelligent preparation for participation in the hearing."[12] (Citations omitted; internal quotation marks omitted.) *Koepke* v. *Zoning Board of Appeals*, 25 Conn. App. 611, 616–17, 595 A.2d 935 (1991), rev'd on other grounds, 223 Conn. 171, 610 A.2d 1301 (1992); accord *Lynch* v. *Muzio*, 204 Conn. 60, 66, 526

A.2d 1336 (1987) ("specific statutory requirements for notice [must] be strictly followed . . . [to ensure] that interested parties receive reasonable notice of an administrative agency decision" [citations omitted]). If the plaintiff possesses statutory standing to contest— and possibly obtain reversal of—a commission's decision to take no action with respect to the zoning classification of its property when it has not filed an application formally requesting such action, but rather simply submitted a letter suggesting as much, it will result in a mechanism in which a zoning change can be obtained without notice ever being provided to neighboring property owners.[13] A fortiori, such a decision would affect the rights of other interested parties, as it would deprive them of their right to fundamental fairness. Such a bizarre scenario could not have been contemplated or intended by the legislature in enacting § 8-8 (a) (1).

In addition, we are mindful of the potentially chilling effect that would result if the plaintiff's interpretation of § 8-8 (a) (1) was adopted. If owners whose property was not the subject of a zoning application and on which the commission elected to take no action nevertheless possess standing to appeal whenever their property is discussed in some manner, municipal zoning commissions might become far more reticent to entertain any informal discussion on requests such as that made by the plaintiff in the present case.

It is axiomatic that "common sense must be used in statutory interpretation, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 141, 680 A.2d 1329 (1996). In light of the foregoing, the plaintiff's interpretation of § 8-8 (a) (1) is neither reasonable nor rational when read in context and applied to the facts of this case. We thus conclude that when a zoning commission, as part of its sua sponte application to amend its zoning regulations or zoning map, refrains from taking action to alter in any manner the zoning classification of a particular property that is not specified in the application as the subject thereof, that property is not "land involved in the decision" of the commission pursuant to § 8-8 (a) (1). The owner of such property, therefore, is not within the narrow class of persons that the statute was intended to protect. See *Abel* v. *Planning & Zoning Commission*, supra, 297 Conn. 427. Accordingly, the court's finding that the plaintiff was not statutorily aggrieved by the commission's decision to amend its zoning map is not clearly erroneous.

## II

### CLASSICAL AGGRIEVEMENT

The plaintiff also alleges that it is classically aggrieved by the commission's decision. "The fundamental test

for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citations omitted; internal quotation marks omitted.) *Harris* v. *Zoning Commission*, 259 Conn. 402, 410, 788 A.2d 1239 (2002).

The plaintiff cannot satisfy that standard. In the present case, the commission decided to amend certain zoning regulations and certain portions of the zoning map—none of which pertained to the plaintiff's property. In addition, that decision did not adversely affect the plaintiff's interest. Its property retained the R-A zoning classification and was not altered or otherwise affected by the amendment in any manner. As owner of the property, the plaintiff remains in precisely the same position it was in prior to the commission's decision to amend the regulations and zoning map. We therefore cannot conclude that the plaintiff, as owner of property that was not the subject of a zoning application and on which the commission refrained from taking any action to alter, was specially and injuriously affected by the commission's decision.[14]

"Unless the plaintiff alleges and proves aggrievement, [its] case must be dismissed." *McNally* v. *Zoning Commission*, 225 Conn. 1, 6, 621 A.2d 279 (1993). Because the plaintiff has failed to establish that it was classically or statutorily aggrieved by the decision of the commission, the court properly dismissed the plaintiff's appeal.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] This administrative appeal was commenced in December, 2009, by Greenwood Manor, LLC, which at that time owned the property in question. Allstar Sanitation, Inc., acquired title to the property on April 16, 2012, and the court subsequently granted a motion to substitute it as the plaintiff in this appeal. At a hearing before the Superior Court, the plaintiff's counsel described Allstar Sanitation, Inc., as a "related entity" of Greenwood Manor, LLC. We refer in this opinion to Allstar Sanitation, Inc., as the plaintiff.

[2] In hearing appeals from decisions of a planning and zoning commission, the Superior Court acts as an appellate body. See General Statutes § 8-8; see also *Par Developers, Ltd.* v. *Planning & Zoning Commission*, 37 Conn. App. 348, 353, 655 A.2d 1164 (1995) (noting zoning appeals in which Superior Court "reviewed the agency's decision in an appellate capacity").

[3] The matter specifically before the commission was known as "Application Number 08-91," which identified the commission as the applicant and the adoption of new zoning regulations as the nature of the proposed action. At the aggrievement hearing before the Superior Court, the plaintiff stipulated that it did not file an application for a zone change and that the commission acted sua sponte in amending the zoning regulations and zoning map.

[4] The record of the November 10, 2008 proceeding indicates that when Rizio's name was called to speak at the public hearing, an unidentified voice stated that "Mr. Rizio had to go to another meeting, but he asked if I would leave this [for] the commission." That unspecified filing then was admitted into the record of the commission's proceeding. We note that Rizio's aforementioned letter is the only document from him to the commission in the record before us and shares the same date as that public hearing.

[5] As the court found in its memorandum of decision, the plaintiff acquired title to the property on April 16, 2012—two years and four months after the commencement of this administrative appeal. On August 2, 2012, the court granted a motion to substitute it as the plaintiff in this appeal. See footnote 1 of this opinion. At no stage of the proceedings has the commission challenged the plaintiff's standing on that basis.

The thorny issue of standing in such situations is addressed by one noted commentary: "A difficult question is whether a person who buys property from the appellant after the commencement of the appeal and successfully intervenes as a plaintiff before trial has standing as an aggrieved party to maintain the appeal. One case [*Fuller* v. *Planning & Zoning Commission*, 21 Conn. App. 340, 346, 573 A.2d 1222 (1990)] relied on the concept that substitution of the buyer is within the court's discretion and that lack of standing to maintain the appeal must be raised by special defense. A footnote in another case [*Neumann* v. *Zoning Board of Appeals*, 14 Conn. App. 55, 56 n.1, 539 A.2d 614, cert. denied, 208 Conn. 806, 545 A.2d 1103 (1988)] also suggests that the buyer is aggrieved. But if aggrievement must exist at the time the appeal is taken, i.e., within 15 days of the publication of the agency's decision, the buyer would not qualify because he was not affected at that time.

"The Supreme Court [in *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 705, 780 A.2d 1 (2001)] granted a motion . . . allowing the substitution of a plaintiff which had obtained title to the property and an assignment of all rights of the original plaintiffs-sellers, and held that the substitute plaintiff had standing to continue the appeal. The opinion did not cite any cases or statutes on the standing question, but noted that the defendant had been given permission to file a supplemental brief on standing but had not filed a brief advancing new arguments. This may resolve the problem of substituting a new plaintiff during the appeal, but there still is an argument based on prior cases which state that aggrievement is based on the appellant's status at the time of the appeal rather than at the time of the trial." (Footnotes omitted.) 9A R. Fuller, supra, § 32.5, p. 154; see also *Foran* v. *Zoning Board of Appeals*, 158 Conn. 331, 336, 260 A.2d 609 (1969) ("It is clear that the plaintiffs did not establish that they were aggrieved persons at the time their appeal was taken. Thus, their purported appeal was as of that time invalid."). In light of our determination that the plaintiff has not demonstrated statutory or classical aggrievement, we need not delve into that hornet's nest.

[6] To be clear, the plaintiff's claim of aggrievement stems from its status as the owner of the property in question, and not as an abutting owner or one within the statutory radius of land involved in the commission's decision. Cf. *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 393, 941 A.2d 868 (2008) (plaintiff not statutorily aggrieved by commission's denial of application for special exception because he "did not own the property" that was subject of application and "did not own land abutting or within 100 feet of the property").

[7] In both instances, the court likewise found the legislative history of § 8-8 (a) (1) to provide little guidance on the question presented. See *Stauton* v. *Planning & Zoning Commission*, 271 Conn. 152, 159 n.8, 856 A.2d 400 (2004); *Caltabiano* v. *Planning & Zoning Commission*, 211 Conn. 662, 667–68, 560 A.2d 975 (1989).

[8] As members of the commission emphasized during their deliberations and as the court in its memorandum of decision specifically found, nothing in the commission's decision to amend the zoning regulations and zoning map prevents "the plaintiff from filing an application with the [commission] seeking to change the zoning classification [of its property] from R-A to a zone permitting additional residential options."

[9] In support of its claim of statutory aggrievement, the plaintiff alleges that the court "committed reversible error when it failed to follow *Latham* v. *Planning & Zoning Commission*, [Superior Court, judicial district of New London, Docket No. CV-07-5002641 (April 5, 2011)]." Apart from providing no authority for the novel proposition that one trial court's decision establishes a precedent binding on all trial courts in this state, the plaintiff's argument

is plagued by the fact that *Latham* does not contain any discussion of statutory aggrievement. The court's two sentence analysis of the aggrievement issue in *Latham* does not cite or discuss any legal authority, and simply states: "The plaintiffs' property was originally included in the application for a zone change and is located in the same vicinity as the property which was rezoned. Accordingly, the plaintiffs are aggrieved by the action of the commission." Id. The paucity of legal analysis and factual findings with respect thereto make it difficult for this court to decipher the basis for that finding of aggrievement. Indeed, it is just as likely that the court in *Latham* found the plaintiffs to be classically aggrieved. We therefore will not resort to speculation and conjecture as to the basis of that court's finding of aggrievement, as they "have no place in appellate review." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009). Furthermore, *Latham* is plainly distinguishable from the present case, as the plaintiff's property was not the subject of the application at issue here. As Freddino noted during the commission's September 14, 2009 meeting, the commission's consideration of the plaintiff's parcel "was driven by one person, one developer's comment" submitted on the date of the first public hearing on the commission's application.

[10] An owner whose property is rezoned as part of a commission's sua sponte amendment of its zoning regulations and zoning map plainly would be statutorily aggrieved and, thus, possess the requisite standing to appeal that determination. The present case concerns those instances in which the commission takes no action to alter in any manner the zoning classification of a plaintiff's property.

[11] In its appellate brief, the plaintiff claims that requiring a "formal application for a zone change" is "nonsensical." It rhetorically asks and answers, "If a board's decision is to be binding . . . what difference does it make whether the board's decision follows from a formal application, an informal application, or something else? None." We submit that interested parties, such as abutting property owners in the plaintiff's neighborhood, would disagree. The legislative history substantiates such a conclusion. As Representative Alex Knopp stated during debate on the 1989 amendment of § 8-8 (a): "[I]t's a reasonable presumption to conclude that an abutting property owner or someone who lives within 100 feet is going to have his or her property interest affected by" the development of nearby property. 32 H.R. Proc., Pt. 25, 1989 Sess., p. 8825.

[12] Among the statutory provisions concerning legal notice is General Statutes § 8-7d (a), which provides in relevant part: "In all matters wherein a formal petition, application, request or appeal must be submitted to a zoning commission, planning and zoning commission or zoning board of appeals . . . and a hearing is required or otherwise held . . . such hearing shall commence within sixty-five days after receipt of such petition, application, request or appeal . . . . Notice of the hearing shall be published in a newspaper having a general circulation in such municipality where the land that is the subject of the hearing is located at least twice, at intervals of not less than two days, the first not more than fifteen days or less than ten days and the last not less than two days before the date set for the hearing. In addition to such notice, such commission, board or agency may, by regulation, provide for additional notice. Such regulations shall include provisions that the notice be mailed to persons who own land that is adjacent to the land that is the subject of the hearing or be provided by posting a sign on the land that is the subject of the hearing, or both. For purposes of such additional notice, (1) proof of mailing shall be evidenced by a certificate of mailing, and (2) the person who owns land shall be the owner indicated on the property tax map or on the last-completed grand list as of the date such notice is mailed. All applications and maps and documents relating thereto shall be open for public inspection. At such hearing, any person or persons may appear and be heard and may be represented by agent or by attorney. . . ." As our courts repeatedly have noted, a "fundamental reason for the requirement of notice [in § 8-7d]" is to "enable parties having an interest to know what is projected and, thus, to have an opportunity to protest." (Internal quotation marks omitted.) *Gaida* v. *Planning & Zoning Commission*, 108 Conn. App. 19, 29–30, 947 A.2d 361, cert. denied, 289 Conn. 922, 923, 958 A.2d 150, 151 (2008).

[13] At the aggrievement hearing, the court specifically inquired as to what remedy the plaintiff was seeking. The plaintiff's counsel responded: "[T]he plaintiff is requesting that the court should vacate the decision as it relates to the property and order [the commission to] rezone the property to R-C . . . ."

[14] Because the plaintiff has not met its burden in establishing that it was aggrieved by the decision of the commission, we do not consider the plaintiff's ancillary allegations of malfeasance on the part of certain commission members in conjunction with other municipal leaders, including Mayor William Finch. As the plaintiff's counsel termed it before the Superior Court, "[t]he allegation is that the [commission] was influenced, coerced, instructed by the city of Bridgeport to not rezone the plaintiff's property." We further do not consider the allegedly improper participation of Commissioner Pappas-Phillips, whose term as a member thereof allegedly had expired. Whatever the merits of those allegations, it remains that the commission's decision to amend its zoning regulations and zoning map did not alter in any manner the zoning classification of the plaintiff's property. As such, the plaintiff lacked standing to advance those allegations before the Superior Court.

———————————————————